38

Deprece Antwon PRATT, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–93–01738–CV.

Court of Appeals of Texas,
Dallas.

Aug. 2, 1995.

**40**

Larry D. Rayford, Dallas, for appellant.

April E. Smith, Assistant District Attorney, Dallas, for appellee.

Before KINKEADE, MORRIS, and WHITHAM[1], JJ.

## OPINION

WHITHAM, Justice (Retired).

Appellant, Deprece Pratt, appeals an order in favor of appellee, the State of Texas, transferring Pratt, a juvenile, to criminal district court to stand trial as an adult. Pratt's appeal focuses on three phases of the proceedings in the trial court which resulted in the following three trial court orders:

Order dated September 10, 1993, denying commitment of Pratt for care, treatment and training to a residential facility for mentally retarded persons;

Order dated September 13, 1993, finding Pratt fit to proceed;

Order dated September 16, 1993, transferring Pratt to criminal district court to stand trial as an adult.

We group and address Pratt's fourteen points of error as they pertain to these three trial court orders. Because we find no merit in any of Pratt's fourteen points of error, we affirm.

## BACKGROUND

The State filed a petition for discretionary transfer of Pratt, a juvenile, alleging that he had committed the offenses of capital murder and five aggravated robberies. Pratt's counsel filed a motion to have Pratt evaluated for mental disease or defect pursuant to the Texas Family Code section 55.04. *See* TEX. FAM.CODE ANN. § 55.04 (Vernon 1986) The State opposed commitment and a jury found that Pratt should not be placed in a long-term residential treatment facility. Subsequently, another jury found Pratt to be competent to stand trial. After a hearing, the trial court granted the State's petition for discretionary transfer and transferred Pratt to criminal district court to stand trial as an adult.

## THE COMMITMENT HEARING

First, we address Pratt's contentions advancing trial court error in denying him commitment to a residential facility for care, treatment and training of mentally retarded persons. We begin with a summary of the evidence adduced from witnesses called by the respective parties.

*COMMITMENT HEARING EVIDENCE*

*Pratt's Witnesses.* Desiree Gilchrist–Fleming, a staff psychologist for the Dallas County Juvenile Department, testified that she gave Pratt the Wechsler Intelligence Scale for Children (WISC) test, which indicated that Pratt was mentally retarded. Gil-

---

1. The Honorable Warren Whitham, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

christ–Fleming testified that average intelligence is about 100. Gilchrist–Fleming testified that the Family Code determined that a person was mentally retarded when he scored 62.5 or less since that was 2.5 standard deviations from the mean. Pratt scored a 48, which was considered moderate mental retardation. Gilchrist–Fleming admitted that the subject's attitude could affect the test results. Gilchrist–Fleming admitted that there was no way to tell if the person taking the test was being deceptive.

Don Gilbert, Executive Director of Dallas County Mental Health and Mental Retardation (DMHMR), testified that DMHMR had a contractual relationship with the Texas Department of Mental Health and Mental Retardation (TMHMR) to provide mental treatment to persons in Dallas County. Gilbert was currently involved in developing a program for children diagnosed as mentally retarded with a conduct disorder, like Pratt. There had been a recent placement of a child in the same position as Pratt. DMHMR is not involved in securing the appropriate facility once the child is committed. There were no locked facilities currently available for placement and it would be a community concern if Pratt were placed in an unlocked facility. The trial court required DMHMR to identify a specific placement facility for Pratt prior to his commitment. There was no appropriate placement for Pratt. However, if the child is committed, TMHMR must find a facility for the child in order to comply with the trial court's commitment order.

Dr. Carol Norton, a psychologist with DMHMR, evaluates persons suspected of being mentally retarded. She tested Pratt as part of the Comprehensive Diagnostic Evaluation (D & E) ordered by the trial court and found his IQ to be 59. Norton referred to IQ tests Pratt had previously taken; all had found Pratt to be mentally retarded except the TONI test conducted by the Texas Youth Commission (TYC). TONI is a nonverbal test used for persons with language disabilities or delays. Norton believed that Pratt needed residential treatment and that Pratt was deficient in his adaptive behavior, meaning the child's ability to perform daily living tasks. Pratt was not meeting his basic needs.

Norton did not believe that Pratt's risk of injury to himself or others was solely because he was mentally retarded. Pratt was also diagnosed with conduct disorder (anti-social behavior) due to his long history of truancy and legal problems. Norton prepared an Addendum to the D & E wherein she concluded that Pratt was not a risk to himself or others because of his retardation. The Addendum also indicated, "based on the available reference of previous testing and his reported functioning in the community, it is likely that these scores significantly underestimate his level of independent functioning in the community." Norton testified that Pratt was able to get around town and that his adaptive behavior score was low because he was not asked to do household chores. Pratt had been referred to juvenile authorities on twelve prior occasions. No facility was currently available which was appropriate for Pratt. Pratt needed structure, programming and living environment training. Pratt was not a risk to himself or others because of his mental retardation.

JoAnn Spencer, an educational specialist with DMHMR, testified that she tested Pratt to determine his educational achievement and scholastic abilities for the D & E. Pratt needed residential treatment. Currently, there was no appropriate facility in which to place Pratt. Pratt's performance on the test was inconsistent and his methods were so haphazard that the information was invalid. During the test, Pratt was disinterested and behaved childishly. The results were not valid on the Street Survival Skill Questionnaire because Pratt was not answering questions she felt he knew or should have known. Spencer disagreed with the Addendum in that she did not feel that Pratt needed to go to TYC for treatment. (Other evidence showed that since TMHMR did not have an appropriate facility for appellant, TYC's Giddings facility was most capable of providing the structure and supervision Pratt required.)

Mary Skillman, program director for DMHMR, testified that she was Dr. Norton's supervisor. Skillman did not recall other

trial courts asking DMHMR to recommend a placement facility as part of the D & E. There were no appropriate facilities for Pratt since he was a security risk.

Janice Bryan, a DMHMR case worker and part of the D & E team, testified that this was the first case she had worked on where the trial court required that a specific facility be named for the placement of the child prior to his commitment. There were no appropriate facilities for Pratt since he needed a locked facility. Similarly situated children had been placed in the past. Bryant testified Pratt needed residential treatment, and recommended that Pratt be placed at TYC's Giddings facility. She acknowledged that "residential care facility" meant a facility operated by TMHMR.

Michael McLelland, a diagnostic psychologist with DMHMR and a member of the D & E team, testified that three of four prior tests placed Pratt in the mentally retarded range. McLelland gave Pratt the Wechsler Adult Intelligence Scale test; Pratt scored 59. McLelland admitted that this test was culturally biased against children who had not attended school. Pratt needed residential treatment. There was no appropriate facility in which to place Pratt. In the past, one child similar to Pratt had been placed at the Mexia facility. While in Mexia, McLelland had been in charge of a program for children with Pratt's problems. The program had been discontinued. McLelland believed that a similar program could be developed again.

*The State's Witnesses.* Rebecca Sullivan, a psychologist who evaluates children sent to TYC, testified that she gave Pratt several IQ tests when he was sent to their facility. On the WISC, Pratt scored a 64; on the TONI, he scored an 81. When Sullivan sees a low score on the WISC, she gives the TONI test to determine whether the child is too mentally deficient to be handled by TYC. Students generally have a higher score on the TONI than the WISC. TONI is given to culturally deprived children since a person without much schooling has as good a chance as one who has been schooled throughout life. In her opinion, Pratt was culturally deprived, not mentally retarded.

Brenda Smith, a social worker for DMHMR, testified that she completed the social history and determined Pratt's adaptive behavioral level (ABL) for the D & E by interviewing family members. Smith felt that the social history she was given by the family was not a comprehensive reflection of Pratt's current functioning level since the mother did not elaborate in her answers, but merely answered the question asked of her. Pratt could use the telephone and public transit to get around town on his own. There were no appropriate facilities for Pratt since he needed a locked facility.

Beverly McLester, Pratt's parole officer from TYC, testified that Pratt was a sophisticated, street-smart child. Pratt had given alias names and fictitious dates of birth to police on several occasions. McLester had participated in a transfer hearing while Pratt was at TYC to send him to a more secure facility. Upon his release from TYC, Pratt participated in the Texas Key Program which was intensive parole supervision. Pratt did not want to participate and responded negatively to the program. Pratt understood the guidelines of the program but did not follow them. Treating Pratt at his home (as an out-patient) was not a viable option.

## COMMITMENT HEARING
## POINTS OF ERROR

In his first three points of error, Pratt contends that the trial court erred in requiring him to prove beyond a reasonable doubt that he needed long-term residential treatment. The issue of the measure of proof arose in this manner. Pratt's attorney filed an application for court ordered commitment to a residential care facility pursuant to TEX. HEALTH & SAFETY CODE ANN. § 593.041 (Vernon 1992 & Supp.1995). Four questions were submitted to the jury regarding Pratt's commitment. The questions and the jury's responses were as follows:

### QUESTION NUMBER 1

Do you find beyond a reasonable doubt that the proposed resident, Deprece Pratt, is a person with mental retardation?

Answer "WE DO" or "WE DO NOT"
ANSWER: *We Do.*

### QUESTION NUMBER 2

Do you find beyond a reasonable doubt that evidence is presented showing that because of retardation, the proposed resident, Deprece Pratt:

(a) represents a substantial risk of physical impairment or injury to himself or others; or

(b) is unable to provide for and is not providing for the proposed resident's most basic and personal physical needs?

Answer "WE DO" or "WE DO NOT"
ANSWER: *We Do Not.*

### QUESTION NUMBER 3

Do you find beyond a reasonable doubt that the proposed resident, Deprece Pratt, cannot be adequately and appropriately habilitated in an available less restrictive setting?

Answer "WE DO" or "WE DO NOT"
ANSWER: *We Do.*

### QUESTION NUMBER 4

Do you find beyond a reasonable doubt that the residential care facility provides habilitative services, care, training and treatment appropriate to the needs of Deprece Pratt, the proposed resident?

Answer "WE DO" or "WE DO NOT"
ANSWER: *We Do Not*

The jury was instructed that Pratt had the burden of proof on these issues beyond a reasonable doubt. As seen, the jury found that Pratt was mentally retarded and that he could not be adequately and appropriately habilitated in an available, less restrictive setting. The jury, however, found against Pratt on the remaining two issues. Because of the jury's response, the trial court did not order Pratt committed to a long-term residential care facility.

Before proceeding, we need to have before us the statutory provisions that all parties agree control the issue presented. The provisions in dispute are found in Chapter 593 of the Health and Safety Code entitled "AD-MISSION AND COMMITMENT TO MENTAL RETARDATION SERVICES." Chapter 593 contains Subchapter B entitled "APPLICATION AND ADMISSION TO VOLUNTARY MENTAL RETARDATION SERVICES" (sections 593.021–593.030) and Subchapter C entitled "COMMITMENT TO RESIDENTIAL CARE FACILITY" (sections 593.041–593.056). (Emphasis added.) In the present case, we are dealing with the provisions regarding involuntary commitment to a mental health facility found in Subchapter C. Here are the crucial statutes:

TEX.HEALTH & SAFETY CODE ANN. § 593.050(e) (Vernon 1992) provides:

> The party who filed the application has the burden to prove **beyond a reasonable doubt** that long-term placement of the proposed resident in a residential care facility is appropriate.

(Emphasis added.)

TEX.HEALTH & SAFETY CODE ANN. § 593.051 (Vernon 1992) provides:

> If long-term placement in a residential care facility is not found to be appropriate, the court shall enter a finding to that effect, dismiss the application, and if appropriate, recommend application for admission to voluntary services under Subchapter B.

TEX.HEALTH & SAFETY CODE ANN. § 593.052 (Vernon 1992) provides:

> (a) A proposed resident may not be committed to a residential care facility unless:
>
> (1) the proposed resident is a person with mental retardation;
>
> (2) evidence is presented showing that because of retardation, the proposed resident:
>
> (A) represents a substantial risk of physical impairment or injury to himself or others; or
>
> (B) is unable to provide for and is not providing for the proposed resident's most basic personal physical needs;
>
> (3) the proposed resident cannot be adequately and appropriately habilitated in an available, less restrictive setting; and

(4) the residential care facility provides habilitative services, care, training, and treatment appropriate to the proposed resident's needs.

(b) If it is determined that the requirements of Subsection (a) have been met and that long-term placement in a residential care facility is appropriate, the court shall commit the proposed resident for care, treatment, and training to a community center or the department when space is available in a residential care facility.

In construing these statutes, we are guided by certain well known principles. Statutes should be construed to give effect to the legislative intent. *Monsanto Co. v. Cornerstones Mun. Util. Dist.*, 865 S.W.2d 937, 939 (Tex.1993). Where the statutory language is unambiguous, the appellate court must seek the legislative intent as found in the plain and common meaning of the words and terms used. *Id.* When the legislature has failed to define a term, its ordinary meaning will be applied. *Id.* In determining the meaning of a statute, a court must consider the entire act, its nature and object, and the consequences that would follow from each construction. *Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 249 (Tex.1991). Interpretations of statutes which would produce absurd results are to be avoided. *Id.*

 Construing the statutes in accordance with these principles, we conclude that section 593.050(e) requires that Pratt prove he needs long-term placement in a residential care facility beyond a reasonable doubt. Indeed, the statute says "beyond a reasonable doubt." We conclude further that if Pratt fails to so prove, the trial court should dismiss the application for long-term residential care. *See* Tex.Health & Safety Code Ann. § 593.051 (Vernon 1991). Hence, we reach the question of what are the elements required to be proved to establish whether long-term placement of the proposed resident in a residential care facility is appropriate. We conclude that we must proceed to section 593.052 for the answer to that inquiry. Thus, we conclude that section 593.052 provides the elements which must be proved to show that a proposed resident needs long-term placement in a residential care facility. We reach this conclusion because section 593.052(a) provides that the proposed resident "may not be committed to a residential care facility unless...." Thus, we reason that if the elements enumerated in section 593.052 are not proved, the proposed resident cannot be committed for long-term placement in a residential care facility. Moreover, in construing these statutes, we conclude that the terms "long-term placement ... in a residential care facility," as used in section 593.050(e), and "commitment," as used in section 593.052(a), are synonymous. We reason that only by such interpretation can we give effect to the legislative intent. *See Monsanto*, 865 S.W.2d at 939.

With this explanation of the statutory structure before us, we turn to the measure of the burden of proof necessary to establish the elements enumerated in section 593.052. In this connection, we read the questions to the jury and the statutory provisions to stand in the following relationships:

Question One—Section 593.052(a)(1)

Question Two—Section 593.052(a)(2)(A)(B)

Question Three—Section 593.052(a)(3)

Question Four—Section 593.052(a)(4)

Next, we observe that Pratt recognizes that he was required to prove all four elements before he can be committed to a long-term residential care facility. Accepting this circumstance, Pratt argues that the terms "long-term placement in a residential care facility" (used in § 593.050(e)) and "commitment" (used in § 593.052(a)) should not be synonymous. Pratt insists that he need only prove that he needs "long-term placement" beyond a reasonable doubt and that he can prove the elements enumerated in 593.052(a) by a preponderance of the evidence or by clear and convincing evidence. We conclude that Pratt reaches this result by reading section 593.052(b) without reference to the other provisions. In this connection, Pratt emphasizes the following language in 593.052(b): "If it is determined that the requirements of Subsection (a) have been met *and* that long-term placement in a residential care facility is appropriate...." Thus, Pratt

would have us focus on the word "and" as used in section 593.052(b) to indicate that sections 593.050(e) and 593.052 are "free standing" and have no relationship to one another in an organized statutory scheme. By such a focus does Pratt seek to escape application of "beyond a reasonable doubt" as used in section 593.050(e), to such evidence as used to prove the "commitment" requirements of section 593.052. We reject Pratt's interpretation of section 593.052(b). Instead, we read the section 593.052(b) phrase "and that long-term placement in a residential care facility is appropriate" as nothing more than a description of the results obtained when the elements of proof required by section 593.052(a) have been established by proof "beyond a reasonable doubt." Consequently, we construe section 593.052(b) to provide that if the elements of section 593.052(a) have been proved beyond a reasonable doubt, then long-term placement of the proposed resident in a residential care facility is appropriate, and the court shall commit the proposed resident for care, treatment and training to a community center or the department where space is available in a residential care facility.

Moreover, we reject Pratt's interpretation of section 593.052(b) and construe section 593.052(b) as we do above because Pratt's interpretation also disregards section 593.051 which provides that the court shall dismiss the application if long-term placement in a residential care facility is not found to be appropriate.

Hence, Pratt's interpretation raises the question under section 593.051 of "not found" by what measures or guidelines? We conclude here again that the measures or guidelines are set forth in the "elements" afforded by section 593.052(a) which establish whether long-term placement or commitment to a residential care facility is or is not appropriate.

Indeed, we conclude that if we were to adopt Pratt's interpretation, section 593.051 should provide, "the trial court shall dismiss if long-term placement in a residential care facility is not appropriate *and* if the requirements of section 593.052(a) are not met." We conclude that to interpret the statute as Pratt would have us do leads to absurd re-sults and should be avoided. *Sharp*, 815 S.W.2d at 249.

Construing sections 593.050(e), 593.051, and 593.052 in their entirety, we conclude that these statutes when read together provide that the "elements" of 593.052(a) refer to and determine the issue of long-term placement and commitment in a residential care facility. Therefore, reading these statutes together, we conclude that the party who files the application has the burden to prove beyond a reasonable doubt the "elements" as required by section 593.052(a). Here Pratt, through his attorney, is the party who filed the application. It follows, therefore, that Pratt was required to prove beyond a reasonable doubt the facts inquired about in jury questions one, two, three and four. Consequently, the trial court did not err in applying an improper burden of proof to issues which the jury was required to consider. We overrule Pratt's first, second and third points of error.

■ In his ninth point of error, Pratt contends that the trial court erred in failing to submit an issue to the jury inquiring whether long-term placement in a residential care facility was appropriate for Pratt. As discussed in our disposition of Pratt's first three points of error, Pratt must prove the "elements" enumerated in section 593.052(a) to be eligible for long-term commitment to a residential care facility. Pratt failed to prove that he met the requirements for commitment to a long-term residential care facility. Had Pratt proven the "elements" enumerated in this section, the trial court would have been required to commit Pratt to a residential care facility. *See* TEX.HEALTH & SAFETY CODE ANN. § 593.052(b) (Vernon 1992). Therefore, the appropriate issues to submit to the jury are those enumerated in section 593.052(a). It follows that the trial court did not err in failing to submit a jury issue on whether long-term placement was appropriate. We overrule Pratt's ninth point of error.

■ In his fourth point of error, Pratt contends that the jury's answer to question number two is against the great weight and preponderance of the evidence. In his fifth

point of error, Pratt contends that the jury's answer to question number four is against the great weight and preponderance of the evidence. We set out above a summary of the testimony of the witnesses called by Pratt and by the State. We read Pratt's position to be that the jury should have been persuaded by his witnesses and should have disregarded the State's evidence. We have no authority under the facts of this case to hold that the jury, as the trier of fact, should have believed the witnesses whose testimony the jury saw fit not to believe. *See Farr v. Bell*, 460 S.W.2d 431, 434–35 (Tex.Civ.App.— Dallas 1970, writ ref'd n.r.e.).

Nevertheless, we point out that the D & E indicates that Pratt does represent a substantial risk of physical impairment or injury to himself and others and he is not capable of providing for his most basic physical needs. However, the Addendum indicated that this was not because of Pratt's mental retardation. Dr. Norton's testimony emphasized that Pratt's risk to himself or others and his inability to provide for his most basic needs was not due to mental retardation. The Addendum indicates that mental retardation was not Pratt's primary diagnosis. Conduct disorder was the primary diagnosis "most in need of treatment."

Dr. Norton testified that Pratt was not meeting his basic needs. However, on cross-examination she testified that this was not because of Pratt's mental retardation. The Addendum indicated that based on Pratt's level of functioning in the community, his ABL scores significantly underestimated his level of independent functioning in the community. Evidence was presented that Pratt could use the telephone and public transportation to get around town on his own and that he was a sophisticated, street-smart child. Pratt was not asked to do household chores and this also resulted in a low ABL score. Brenda Smith testified that the social history was not a comprehensive reflection of Pratt's current level of functioning either.

The D & E indicated that there was no appropriate residential facility currently in existence for Pratt. Numerous witnesses also testified that there was no facility appropriate to treat Pratt's needs. While a pro-

gram had been in existence at the Mexia facility in the past, and children with problems similar to Pratt's had been placed there, the program had been discontinued and was not currently available. Although numerous witnesses testified that a proposal was being presented to State authorities for facilities to treat persons with disorders like Pratt's, the facility did not exist nor was the proposal certain to be put into effect. The Addendum indicates, "Although Deprece meets the criteria for commitment to Mental Retardation Services, his actual treatment needs would be best served by the TYC system." Janice Bryan agreed with this recommendation. JoAnn Spencer disagreed with this proposed treatment for Pratt.

In connection with this evidence we note that Tex.Health & Safety Code Ann. § 591.003(18) (Vernon 1992) provides: " 'residential care facility' means a facility **operated by the department or a community center** that provides 24–hour services, including domiciliary services, directed toward enhancing the health, welfare, and development of persons with mental retardation." (Emphasis added.) Further, section 593.052(b) requires that the proposed resident shall be committed "to a community center or the department when space is available in a residential care facility." Since the code requires that the residential facility be operated by TMHMR, or a community center, placement of Pratt at Giddings, a TYC facility, was not a proper placement. This was acknowledged by Pratt's witness Janice Bryan. Moreover, the evidence did not show that Pratt could not, because of his mental retardation, meet his most basic and personal needs. To the contrary, there was evidence showing that Pratt could function in society and that any deficit in his ABL was because he was not required to perform chores at home. Also, Pratt did not show that his alleged mental retardation caused him to be a risk to himself or others. To the contrary, his "risk" was based on the primary diagnosis of conduct disorder.

It is fundamental that these fact findings must be upheld if there is more than a scintilla of evidence in support thereof. *Stedman v. Georgetown Sav. & Loan Ass'n,*

595 S.W.2d 486, 488 (Tex.1979). In reviewing "factually insufficient" points, we consider all the evidence including any evidence contrary to the judgment. *Burnett v. Motyka,* 610 S.W.2d 735, 736 (Tex.1980). A finding can be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). Furthermore, we observe the alternatives available to the jury when presented with conflicting evidence. The trier of fact has several alternatives available when presented with conflicting evidence. It may believe one witness and disbelieve others. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986). The trier of fact may resolve inconsistencies in the testimony of any witness. *McGalliard,* 722 S.W.2d at 697. As a general rule, it is peculiarly within the province of the jury to weigh opinion evidence and the judgment of experts. *Octane Oil Refining Co. v. Blankenship–Antilley Implement Co.,* 117 S.W.2d 885, 886 (Tex.Civ.App.—Eastland 1938, no writ). It is within the province of the jury to decide which expert witness should be credited. *American Airlines, Inc. v. United States,* 418 F.2d 180, 194 (5th Cir.1969). Applying these principles, we conclude that the jury in the present case could believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness. Indeed, the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Leyva v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547, 549 (1962). Hence, in our disposition of points of error four and five challenging the factual sufficiency of the evidence, we are mindful of the alternatives available to the jury when presented with conflicting evidence.

■ Thus, we turn to our assigned task of deciding whether the evidence is factually sufficient to support the challenged jury findings. In doing so, we must apply the instructions of *Burnett,* 610 S.W.2d at 736, as directed in *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 633–35 (Tex.1986). Considering all the evidence and inferences therefrom, we conclude that the evidence is factually sufficient to support the jury's challenged findings. With no more than Pratt shows us as

evidence contrary to the jury's challenged findings, considering and weighing all the evidence, we are unable to state in what regard the contrary evidence greatly outweighs the evidence in support of the jury's findings. *Pool,* 715 S.W.2d at 635. It is not the duty of the court of appeals to make an independent search of the statement of facts. *Fredonia State Bank v. General Am. Life Ins. Co.,* 881 S.W.2d 279, 283 (Tex.1994) (quoting *Most Worshipful Prince Hall Grand Lodge v. Jackson,* 732 S.W.2d 407, 412 (Tex.App.—Dallas 1987, writ ref'd n.r.e.)). In the present case, therefore, we cannot hold that the jury's findings are factually insufficient. Moreover, we cannot hold that the jury's findings are so against the great weight and preponderance of the evidence as to be manifestly unjust, or that the jury's findings shock the conscience of this Court, or that the jury's findings clearly demonstrate bias. *See Pool,* 715 S.W.2d at 635. In short, we cannot agree to "unfind" the jury's findings and substitute our judgment for that of the jury. We hold, therefore, that the evidence is factually sufficient to support the jury's findings to questions two and four and that the jury's findings to questions two and four are not against the great weight and preponderance of the evidence. We overrule Pratt's points of error four and five.

■ In his sixth point of error, Pratt contends that the trial court erred by requiring Pratt to submit to an evaluation by an expert witness hired by the prosecution in violation of Pratt's rights under the state and federal constitutions and the Texas Family Code. On March 29, 1993, the trial court, pursuant to the State's request, made the challenged order appointing a psychologist to examine Pratt. We read Pratt's argument as asserting the deprivation of constitutional and statutory rights. We fail to perceive the nature of the deprivation. The State offered no evidence of mental retardation from an expert who examined Pratt after the trial court's order. Therefore, we conclude that Pratt's asserted constitutional and statutory rights could not have been violated. Indeed, the State's only psychological expert who testified at the mental retardation trial examined Pratt on February 21, 1992. Because

no evidence was presented at the mental retardation trial from an expert who examined Pratt pursuant to the March 29 order, we conclude that Pratt's asserted constitutional and statutory rights were not violated. We overrule Pratt's sixth point of error.

In his seventh point of error, Pratt contends that the trial court erred by not initiating proceedings for Pratt's commitment as required by Chapter 55 of the Texas Family Code and TEX.HEALTH & SAFETY CODE ANN. § 593.041 (Vernon 1992 & Supp.1995). In his eighth point of error, Pratt contends that the trial court erred by not appointing a guardian ad litem to represent Pratt in the commitment proceedings brought under TEX. FAM.CODE ANN. § 55.03 (Vernon 1986 & Supp.1995) and TEX.HEALTH & SAFETY CODE ANN. § 593.041 (Vernon 1992 & Supp.1995). Pratt briefs and argues these two points together. In these two points of error, Pratt complains of the trial court's failure to initiate commitment proceedings on its own motion and the failure to appoint a guardian ad litem for Pratt. We begin by setting forth the two statutes in question.

TEX.FAM.CODE ANN. § 55.03(a) (Vernon 1986) provides:

> If it appears to the juvenile court, on the suggestion of a party or on the court's own notice, that a child alleged or found to have engaged in delinquent conduct or conduct indicating a need for supervision may be mentally retarded, the court shall order a comprehensive diagnosis and evaluation of the child to be performed at a facility approved by the Texas Department of Mental Health and Mental Retardation. If the court finds that the results of such comprehensive diagnosis and evaluation indicate a significantly subaverage general intellectual function of 2.5 or more standard deviations below the age-group mean for the tests used existing concurrently with deficits in adaptive behavior of Levels I–IV, the court shall initiate proceedings to order commitment of the child to a facility for the care and treatment of mentally retarded persons.

TEX.HEALTH & SAFETY CODE ANN. § 593.041(a) provides:

> A proposed resident, if an adult, a parent if the proposed resident is a minor, the guardian of the person, the court, or **any other interested person,** including a community center or agency that conducted a diagnosis and evaluation of the proposed resident, may file an application for a determination that the proposed client is in need of long-term placement in a residential care facility.

(Emphasis added.)

The sequence of events is important. On March 22, 1993, Pratt's attorney filed an application for court ordered commitment seeking to have Pratt committed to a residential care facility. In this connection, we conclude that Pratt's attorney was an "interested person" within the meaning of section 593.041(a). Later, on May 25, 1993, Pratt's attorney filed a written motion for appointment of a guardian ad litem. Contained within the body of this writing is found an allegation that under section 55.03 of the Texas Family Code the trial court has a mandatory duty to itself initiate commitment proceedings. The motion proceeds to request that the trial court carry out its alleged mandatory duty to initiate commitment proceedings. Thus, two months after Pratt sought to have himself committed to a residential care facility, Pratt sought to shift to the trial court the responsibility of initiating, and proceeding with, the undertaking necessary to have Pratt committed to a residential care facility.

For the purposes of this opinion, we assume, but do not decide, that the trial court had a mandatory duty itself to initiate commitment proceedings. We conclude, however, that Pratt waived trial court compliance with any such mandatory duty by first filing on March 22 his application for court-ordered commitment to a residential care facility. Indeed, we are not persuaded by Pratt's argument that he unfairly undertook the burden of proof as movant in the commitment proceedings instead of the trial court. We reason Pratt determined as a part of his trial strategy that it was in his best interest to seek long-term commitment in a residential care facility rather than face criminal

charges for the offense of capital murder and five aggravated robberies.

■ Next, we turn to consider the second prong in Pratt's effort to escape the result of his March 22 trial strategy; to wit, the contention that the trial court erred in failing to appoint a guardian ad litem. Again, we note that it was not until later on May 25 that Pratt sought the appointment of a guardian ad litem. Here, we are not persuaded by Pratt's argument that his attorney faced a conflict of interest in serving as an advocate for long-term commitment and as counsel representing Pratt's point of view. We conclude that any such conflict is hypothetical as it presumes the two goals were contradictory. Indeed, there is no support in the record for that presumption. On the contrary, the defense tactic of seeking long-term commitment was advanced as in Pratt's best interest and there is no suggestion that Pratt preferred to go to trial on the criminal charges. Further, the Texas Family Code provides that a child's attorney and his guardian ad litem may be one and the same individual. TEX.FAM.CODE ANN. § 51.11(c) (Vernon 1986).

On this record and for the above reasons, we conclude that the trial court did not err in failing to initiate commitment proceedings on its own motion and in failing to appoint a guardian ad litem for Pratt. We overrule Pratt's seventh and eighth points of error.

■ In his eleventh point of error, Pratt contends that the trial court erred by not proceeding on the record in responding to a question submitted by the jury to the court. During jury deliberations on the application for commitment, the jury sent out this question:

> As to question No. 4, does this refer to an existing residential care facility?

Pratt argues that the trial court erred when it answered this question from the jury without proceeding on the record. On appeal, the court reporter shall report any portion of the proceedings *requested by either party* or directed by the court. TEX.FAM.CODE ANN. § 56.02(d) (Vernon Supp.1986). (Emphasis added.) Neither the State nor Pratt made a request to record communications with the jury during deliberations. Moreover, neither the request for preparation of the statement of facts nor the request for preparation of the transcript, both signed by Pratt's attorney, mentions the trial court's response to the jury question. Like the Family Code, the Texas Rules of Appellate Procedure do not require that communications with the jury be made part of the transcript. *See* TEX.R.APP.P. 51(a). Furthermore, Pratt failed to object to the proceedings at trial or to request that the trial court's response be included in the record. On this record, we conclude that Pratt waived his right to complain that the trial court erred by not proceeding on the record in responding to a question submitted by the jury to the court. We overrule Pratt's eleventh point of error.

### THE FITNESS TO PROCEED HEARING

■ In his twelfth point of error, Pratt contends that the trial court erred by wording instructions on the issue of fitness to proceed in the disjunctive rather than the conjunctive. The complained-of charge reads, in pertinent part:

> ... you are instructed that in law, a person is deemed unfit to proceed to stand trial if as a result of mental disease or defect, he lacks the capacity (1) to understand the proceedings in juvenile court *or* (2) to assist in his own defense.

(Emphasis added.) Pratt complains that the wording of the jury charge in the disjunctive increases his burden of proof. We disagree. We conclude that use of the disjunctive is harmless to Pratt. We reach this conclusion because the use of the word "or" places a lower burden of proof on Pratt than would the use of the word "and." We reason that it is less of a burden to prove one thing than to prove two. Consequently, we conclude that if the trial court's wording of the jury charge is in error, the error is harmless to Pratt. We overrule Pratt's twelfth point of error.

### THE TRANSFER OF PRATT TO CRIMINAL DISTRICT COURT TO STAND TRIAL AS AN ADULT

■ In his tenth point of error, Pratt contends that the trial court erred in failing to comply with the Texas Family Code by

failing to completely admonish him. Pratt argues that the trial court did not comply with TEX.FAM.CODE ANN. § 54.03(b) (Vernon Supp.1995) since the admonishments at Pratt's discretionary transfer hearing were incomplete. We conclude that section 54.03(b) does not apply to discretionary transfer hearings. We reach this conclusion because the admonishment requirement of section 54.03(b) applies to adjudications but does not apply to discretionary transfers since transfer hearings are not adjudicational but rather are dispositional in nature. *M.A.V., Jr. v. Webb County Court at Law,* 842 S.W.2d 739, 748 (Tex.App.—San Antonio 1992, writ denied) (citing *In re G.B.B.,* 638 S.W.2d 162, 164 (Tex.App.—Houston [1st Dist.] 1982, no writ)); *see also Matter of S.E.C.,* 605 S.W.2d 955, 957 (Tex.App.—Houston [1st Dist.] 1980, no writ) (since a certification hearing is not an adjudicatory hearing, the trial court does not consider admissibility of a confession). We conclude, therefore, that the cases cited by Pratt in support of this alleged error are not applicable to the present case since each case cited involved an adjudication hearing rather than a discretionary transfer hearing. It follows that the trial court did not err in failing to comply with TEX.FAM.CODE ANN. § 54.03(b). We overrule Pratt's tenth point of error.

In his thirteenth point of error, Pratt contends that the trial court erred in transferring Pratt to stand trial as an adult without first conducting a legally adequate trial concerning the need for Pratt to be committed to a facility for the mentally retarded. Pratt complains that the trial court erred in certifying Pratt to stand trial as an adult because the commitment hearing was inadequate. Pratt focuses on that language in section 55.03(a) which reads:

> If the court finds that the results of such comprehensive diagnosis and evaluation indicate a significantly subaverage general intellectual function of 2.5 or more standard deviations below the age-group mean for the tests used existing concurrently with deficits in adaptive behavior of Levels I–IV, the court shall initiate proceedings to order commitment of the child to a facility

for the care and treatment of mentally retarded persons.

TEX.FAM.CODE ANN. § 55.03(a) (Vernon 1986).

Therefore, Pratt argues that his points of error one through eleven should be sustained and the trial court's *order of transfer* must be reversed because the trial court failed to complete the above determination required by section 55.03(a) *pertaining to commitment.* We note, however, that the asserted trial court determination in question bears on initiation by the trial court of proceedings to order commitment. As we point out in our disposition of Pratt's seventh and eighth points of error, Pratt initiated the commitment proceedings before asking the trial court to act. Hence, we conclude that Pratt waived any asserted requirement that the trial court make the determination in question. In concluding that Pratt waived such asserted requirement for trial court determination, we express no opinion as to the interpretation and application of the above quoted portion of section 55.03(a).

As indicated earlier, we have overruled Pratt's points of error one through eleven. Indeed, we have concluded that the trial court properly refused to order Pratt committed to a residential care facility because he failed to meet the statutory requirements for commitment as provided in section 593.052(a). Because we have concluded that the trial court properly conducted a commitment hearing, it follows that the trial court did not err in ordering the transfer of Pratt to stand trial as an adult. We overrule Pratt's thirteenth point of error.

In his fourteenth point of error, Pratt contends that the trial court erred in transferring Pratt to stand trial as an adult without first conducting a legally adequate trial concerning Pratt's alleged incompetency to stand trial. TEX.FAM.CODE ANN. § 55.04 (Vernon 1986) uses the term "unfit to proceed" to refer to the defendant's competency. For ease of use, we will refer to this hearing as a competency hearing. Pratt complains that the trial court erred in transferring him to stand trial as an adult because the trial court failed to conduct a proper competency hearing. Pratt refers to his argument under his twelfth point of error to show that the

transfer order is invalid since the competency hearing was not proper. Earlier we concluded that the trial court did not err in its instruction to the jury in the disjunctive and concluded that such instruction lessened Pratt's burden of proof on the competency issue. Thus, we overruled Pratt's twelfth point of error. Next, Pratt continues to urge his contention that the determination of his competency has not been resolved so as to allow an order of discretionary transfer to be valid. In earlier disposing of all of Pratt's points of error pertaining to competency issues, we conclude that we have resolved adversely to Pratt all competency issues raised by Pratt. Having resolved all competency issues raised by Pratt adversely to Pratt's various contentions, we conclude that the competency hearing affords Pratt no basis upon which to challenge his transfer to stand trial as an adult. For the above reasons, we overrule Pratt's fourteenth point of error.

Affirmed.