Opinion filed August 21, 2014



In The

# Eleventh Court of Appeals

_____

## No. 11-14-00156-CV

_____

## IN THE MATTER OF A.W., A PROPOSED PATIENT

**On Appeal from the County Court at Law**
**Midland County, Texas**
**Trial Court Cause No. MI 12,509**

## O P I N I O N

Appellant, A.W., a minor, appeals from the trial court's order committing her to the San Angelo State Supported Living Center (SSLC) to receive care, treatment, and training for a period of twelve months. We reverse and remand.

### Background Facts

A.W. is sixteen years old. Her mother is deceased. The parental rights of her father have been terminated. The Texas Department of Family and Protective Services (the Department) is the sole managing conservator of A.W. In May 2013, A.W. was diagnosed with an intellectual disability that is commonly referred to as mental retardation. A.W.'s IQ scores placed her within the mild range of mental

retardation. Upon A.W.'s diagnosis, she became qualified to receive services from Appellee, Permian Basin Community Centers for MHMR (PBCC).

On October 4, 2013, A.W. was committed to the San Antonio State Hospital (SASH) to receive inpatient psychiatric treatment. A child psychiatrist, a psychologist, and a social worker were on A.W.'s treatment team at SASH. In March 2014, A.W.'s treatment team at SASH determined that A.W. had reached the maximum benefit that she could receive from treatment at SASH, that A.W. no longer needed inpatient psychiatric hospitalization, and that A.W. had met the criteria for discharge. The treatment team recognized that, after her discharge, A.W. would need to receive treatment in a facility that could provide her with a structured and controlled environment. A.W.'s discharge from SASH was scheduled to occur on or before April 22, 2014.

The Department could not find a placement for A.W. The Department requested PBCC's help in its efforts to find a placement. On April 24, 2014, Kelly Dirden, the continuity care intake team leader for PBCC and acting on behalf of PBCC, filed an application requesting the long-term placement of A.W. into a residential facility. Specifically, PBCC requested the trial court to place A.W. in the San Angelo State Supported Living Center (SSLC). Dirden made the following allegations, among others, in the application:

> 4. The following is a short and plain statement of the facts to show that commitment to [a] residential care facility is necessary and appropriate[:] [A.W.] is diagnosed with Mild Intellectual Disability. She is currently at the San Antonio State Hospital where she has been for the past seven months. She continues to express the desire to hurt herself and others, both verbally and with action. [A.W.] will threaten to kill herself and others when she doesn't get her way. She will destroy property and exhibit such extreme behavior that she has to be restrained in a restraint chair. Her behavior puts herself and others at risk for bodily harm. The Department of Family and Protective Services is unable to locate placement for [A.W.] because of her

2

continued behavior both in community placement and at the San Antonio State Hospital. [A.W.] cannot be adequately and appropriately habilitated in an available, less restrictive setting. The San Angelo State Supported Living Center is able to provide for [A.W.]'s habilitative service, care, training, and treatment that is appropriate for [A.W.].

5. The following is a short and plain statement explaining the inappropriateness of admission to less restrictive services: [A.W.] is inappropriate for other less restrictive services because her behavioral needs exceed what can be provided for in the community. She has multiple failed placements in residential treatment facilities. While at the San Antonio State Hospital[,] [A.W.] continues to exhibit aggressive and violent behavior. She threatens to harm herself and others.

Dirden stated in the application that "a copy of the summary report and recommendations of the diagnosis and evaluation team" was attached to the application.

The report that Dirden attached to the application was a PBCC Individual Service Record that related to A.W. Dirden prepared the report on April 14, 2014, after she talked with Nancy Jacks, a Department employee, by telephone on the same date. Dirden wrote the following progress note in the report:

I received a call from Nancy Jacks, CPS DD Specialist about [A.W.]. Nancy stated that Providence is looking for placement, but feel that they will not be able to locate placement before April 22, 2014 – the end of the 30 day referral from the San Antonio State Hospital. I told Nancy that I would finalize the SSLC application and submit it on behalf of [A.W.]. Nancy agreed to the placement. We discussed the multiple placements that have failed for [A.W.] and that the best course of action would be long[-]term placement in a State Supported Living Center to meet her needs. We also discussed that [A.W.] continues to represent a substantial risk to herself by threatening to harm herself, making suicidal jesters [sic], i.e. attempting to cut her arms with a card and tying pillow cases around her neck. [A.W.] is risking others['] safety by threatening and making

3

physically aggressive moves against staff when they attempt to redirect her. Since [A.W.] is not able to be rehabilitated in a less restrictive environment and the SSLC is able to provide appropriate habilitative care, training and treatment the IDT makes a formal referral and recommendation to the SSLC.

As used in Dirden's progress note, the term "IDT" was an abbreviation for interdisciplinary team.

The trial court appointed counsel to represent A.W. A.W.'s counsel filed a motion to dismiss PBCC's application on the grounds that the trial court lacked jurisdiction to hear the case and that PBCC's pleadings were deficient. The trial court held a hearing on A.W.'s motion to dismiss. A.W.'s counsel argued that PBCC had failed to file an interdisciplinary team report that satisfied the statutory requirements for such a report and that, therefore, the trial court should dismiss the case. *See* TEX. HEALTH & SAFETY CODE ANN. § 593.013 (West 2010) (Requirement of Interdisciplinary Team Recommendation); *id.* § 593.041 (Application for Placement; Jurisdiction). The trial court concluded that the "report" that was attached to PBCC's application "[was] sufficient to comply with the requirements for the interdisciplinary team report." The trial court denied A.W.'s motion to dismiss.

The trial court held an evidentiary hearing on PBCC's application. PBCC and A.W. presented witnesses at the hearing. After the hearing, the trial court entered its order committing A.W. to the SSLC for a period of twelve months. The trial court further ordered that "[A.W.] shall be retained at [SASH] until such time as the transition is made to the [SSLC]."

The trial court entered findings of fact and conclusions of law. The trial court made the following findings of fact, among others:

> 4. [A.W.] was diagnosed with an intellectual disability in May 2013 and is a person with mental retardation/intellectual disability;

4

5. [A.W.] has been in eight placements in the past two years and five of those placements were following her diagnosis of intellectual disability[;]

6. [A.W.] has attempted to elope from placements prior to her placement in the San Antonio State Hospital[;]

7. [A.W.] has engaged in self-injurious behaviors within the past month while at the San Antonio State Hospital, specifically she tied objects and clothing around her neck with the intent of making herself "pass out" or "go to sleep" and intervention was required by staff to remove the objects or clothing[;]

8. [A.W.] has been assaultive and aggressive toward staff at San Antonio State Hospital within the past month resulting in injury to both herself and the staff members[;]

9. [A.W.]'s behaviors within the past month have required hospital staff to apply physical restraint, mechanical restraint, and chemical (medication) restraint[;]

10. Because of her mental retardation/intellectual disability, [A.W.] represents a substantial risk of physical injury to herself or other[s] and is unable to provide for and is not providing for her most basic personal physical needs as she requires guidance and direction for physical hygiene and care;

11. [A.W.] cannot be adequately and appropriately habilitated in an available, less restrictive setting, specifically in the fact that the Department of Family and Protective Services has been unable to locate a foster home or residential treatment facility that is willing to accept her or able to meet her need[s] despite contacting at least 25 different facilities within the State of Texas;

12. After being unable to locate a residential treatment facility to meet [A.W.]'s need[s], efforts were made to identify a Home and Community Services (HCS) program for [A.W.]. The only HCS home that was willing to consider [A.W.] is a program called Chrysalis. The testimony of the director of the Chrysalis program was

that although the program is willing to accept [A.W.], it would be difficult to provide services to a client that has a habit of elopement from prior placements or a pattern of self-injurious behaviors. Additionally, the HCS program is limited in its ability to provide restraint if the client's behavior became out of control. The HCS staff could not physically confine [A.W.] in the home if she chose to leave and they could only provide limited assistance if she attempted to harm herself or others. If [A.W.]'s behaviors could not be controlled or she was attempting to harm herself or others, law enforcement or emergency medical services would likely be called[;]

13. The testimony from the Department of Family and Protective Services supervisor was that the program offered by the Chrysalis HCS home was not adequate to protect [A.W.] from herself, was not adequate to protect others from [A.W.]'s aggressive behavior, and could result in [A.W.] being returned to a psychiatric hospital or entering the criminal justice system[;]

14. The San Angelo State Supported Living Center (residential care facility) provides habilitative services, care, training, and treatment appropriate to [A.W.]'s needs and will be able to provide a safe and stable placement for [A.W.]. The testimony of the Permian Basin Community Centers (MHMR) supervisor was that the State Supported Living Center would provide programs to allow [A.W.] to develop the skills needed so that she could eventually be considered for placement in a less restrictive environment and that regular reviews are conducted to assess a client's progress toward this goal.

The trial court made the following conclusions of law:

1. [A.W.] is a person with mental retardation/intellectual disability;

2. [A.W.] represents a substantial risk of physical impairment or injury to herself or other[s] and is unable to provide for and is not providing for her most basic personal physical needs;

3. [A.W.] cannot be adequately and appropriately habilitated in an available, less restrictive setting; and

4. The State Supported Living Center (residential care facility) provides habilitative services, care, training, and treatment appropriate to [A.W.'s] needs.

A.W. presents four appellate issues for review. In her first issue, A.W. contends that the trial court lacked jurisdiction to hear PBCC's application for long-term commitment because no interdisciplinary team report that complied with statutory requirements was on file at the time of the hearing. In her second issue, A.W. contends that the trial court erred when it ordered her to be committed to the SSLC because no competent medical or psychiatric testimony supported the commitment. In her third issue, A.W. challenges the legal and factual sufficiency of the evidence to support her commitment to the SSLC. Specifically, A.W. contends that the evidence presented was legally and factually insufficient to prove beyond a reasonable doubt that she is a substantial risk of harm to herself or others, that she cannot provide for her most basic personal needs, or that she cannot be habilitated in a less restrictive environment. In her fourth issue, A.W. contends that the trial court erred when it ordered her to be committed for a period of twelve months because no statutory provision authorizes a trial court to impose a minimum period of time for a long-term commitment.

Section 593.041(c) of the Health and Safety Code provides that "[t]he county court has original jurisdiction of all judicial proceedings[1] for commitment of a person with mental retardation to residential care facilities." HEALTH & SAFETY § 593.041(c). Section 593.041(d) provides as follows:

A person may not be committed to the department for placement in a residential care facility under this subchapter unless a

---

[1]In this case, PBCC filed its application in the County Court at Law of Midland County, which is a statutory county court. TEX. GOV'T CODE ANN. § 25.1671 (West 2004). Statutory county courts also have jurisdiction in these commitment proceedings. *Id.* § 25.003(a) (West Supp. 2013) ("A statutory county court has jurisdiction over all causes and proceedings, civil and criminal, original and appellate, prescribed by law for county courts.").

report by an interdisciplinary team recommending the placement has been completed during the six months preceding the date of the court hearing on the application. If the report and recommendations have not been completed or revised during that period, the court shall order the report and recommendations on receiving the application.

*Id.* § 593.041(d).

PBCC contends that, in this case, the interdisciplinary team consisted of Dirden and Jacks and that Dirden's April 14, 2014 report satisfied the substantive requirements for an interdisciplinary team report. A.W. contends that Dirden's report failed to comply with the statutory requirements for an interdisciplinary team report because the report lacked participation by required team members and because the report failed to satisfy the substantive requirements of a team report.

Section 591.003(8) defines "[i]nterdisciplinary team" as "a group of mental retardation professionals and paraprofessionals who assess the treatment, training, and habilitation needs of a person with mental retardation and make recommendations for services for that person." HEALTH & SAFETY § 591.003(8) (West Supp. 2013). A detailed definition of "interdisciplinary team" is found in the Texas Administrative Code:

> IDT (Interdisciplinary team)--Mental retardation professionals and paraprofessionals and other concerned persons, as appropriate, who assess an individual's treatment, training, and habilitation needs and make recommendations for services, including recommendations of whether the individual is best served in a facility or in a community setting.
>
> (A) Team membership always includes:
>
> > (i) the individual;
> >
> > (ii) the individual's [legally authorized representative], if any; and

(iii) persons specified by [a mental retardation authority] or a state MR facility, as appropriate, who are professionally qualified and/or certified or licensed with special training and experience in the diagnosis, management, needs, and treatment of individuals with mental retardation.

(B) Other participants in IDT meetings may include:

(i) other concerned persons whose inclusion is requested by the individual or the [legally authorized representative];

(ii) at the discretion of the [mental retardation authority] or state MR facility, persons who are directly involved in the delivery of mental retardation services to the individual; and

(iii) if the individual is school eligible, representatives of the appropriate school district.

40 TEX. ADMIN. CODE § 2.253(20) (Tex. Dep't of Aging and Disability Servs.).

In this case, Dirden and Jacks were the only team members. No medical doctors, psychiatrists, or psychologists were included as team members. Dirden's report did not show that either Dirden or Jacks was a mental retardation professional or paraprofessional as defined in Section 591.003(8) of the Health and Safety Code. Thus, the team apparently lacked the participation of "mental retardation professionals and paraprofessionals who assess the treatment, training, and habilitation needs of a person with mental retardation and make recommendations for services for that person." *See* HEALTH & SAFETY § 591.003(8). Dirden acknowledged in her testimony that she was not qualified to determine whether a person's behavior is related to a psychiatric condition or,

instead, to an intellectual disability and that she must rely on the recommendations of doctors on these issues. Additionally, Dirden and Jacks failed to include A.W. as a team member. We conclude that, in this case, the "team" failed to meet the statutory definition of an interdisciplinary team and that, therefore, Dirden's report did not satisfy the statutory requirements for an interdisciplinary team report.

Section 593.013(a) provides that "[a] person may not be admitted or committed to a residential care facility unless an interdisciplinary team recommends that placement." HEALTH & SAFETY § 593.013(a). The other subsections in Section 593.013 establish the duties of an interdisciplinary team:

(b) An interdisciplinary team shall:

(1) interview the person with mental retardation, the person's parent if the person is a minor, and the person's guardian;

(2) review the person's:

(A) social and medical history;

(B) medical assessment, which shall include an audiological, neurological, and vision screening;

(C) psychological and social assessment; and

(D) determination of adaptive behavior level;

(3) determine the person's need for additional assessments, including educational and vocational assessments;

(4) obtain any additional assessment necessary to plan services;

(5) identify the person's habilitation and service preferences and needs; and

(6) recommend services to address the person's needs that consider the person's preferences.

(c) The interdisciplinary team shall give the person, the person's parent if the person is a minor, and the person's guardian an opportunity to participate in team meetings.

(d) The interdisciplinary team may use a previous assessment, social history, or other relevant record from a school district, public or private agency, or appropriate professional if the interdisciplinary team determines that the assessment, social history, or record is valid.

(e) The interdisciplinary team shall prepare a written report of its findings and recommendations that is signed by each team member and shall promptly send a copy of the report and recommendations to the person, the person's parent if the person is a minor, and the person's guardian.

(f) If the court has ordered the interdisciplinary team report and recommendation under Section 593.041, the team shall promptly send a copy of the report and recommendations to the court, the person with mental retardation or the person's legal representative, the person's parent if the person is a minor, and the person's guardian.

*Id.* § 593.013(b)–(f).

Dirden's report consisted of a brief summary of her telephone call with Jacks. The report failed to comply with the requirements of Section 593.013 in numerous respects. For example, the report did not show that Dirden and Jacks interviewed A.W. or that Dirden and Jacks reviewed any medical, psychological, or social assessment. *See id.* § 593.013(b)(1), (2). Nor did Dirden and Jacks identify or recommend any medical, social, psychological, behavioral, or other habilitative services for A.W. *See id.* § 593.013(b)(5), (6). Dirden's report did not

satisfy the requirements for an interdisciplinary team report under Sections 593.013 or 593.041(d).

Under Section 593.041(d), the trial court could not commit A.W. to the SSLC because a sufficient interdisciplinary team report had not been completed. Thus, the trial court erred when it entered its order committing A.W. to the SSLC. *See id.* § 593.041(d). A.W. argues that the trial court lacked jurisdiction to hear the case in the absence of a sufficient report. Based on the statutory language in Section 593.041(d), we do not view the issue as jurisdictional. Under Section 593.041(d), when an interdisciplinary team report has not been completed, the trial court is required to "order the report and recommendations on receiving the application." *Id.* Thus, a trial court does not lack jurisdiction in a case when no report has been filed. Instead, the trial court must order the report to be filed before hearing the application. A.W. challenged the sufficiency of Dirden's report in the trial court. Because the report was insufficient, the trial court should have ordered PBCC to file an interdisciplinary team report and recommendations before proceeding to a hearing on the merits of PBCC's application.

A.W.'s first issue is sustained to the extent that she complains that the trial court erred when it entered its order of commitment. The remainder of A.W.'s first issue is overruled.

A.W. argues in her second issue that expert medical or psychiatric testimony is required to support a trial court's commitment order under Section 593.052 of the Health and Safety Code. Thus, A.W. contends that, because PBCC failed to present such testimony in this case, the evidence was legally insufficient to support the trial court's order. A.W. relies on Article I, section 15-a of the Texas Constitution to support her argument. That section provides that "[n]o person shall be committed as a person of unsound mind except on competent medical or psychiatric testimony." TEX. CONST. art. I, § 15-a.

12

Subtitle D of the Health and Safety Code is referred to as the "Persons with Mental Retardation Act."[2] We have examined the relevant provisions of the Act, and we conclude that the commitment of a person with mental retardation to a residential care facility is not a commitment of a person of unsound mind for the purpose of Article I, Section 15-a of the Texas Constitution. The term "mental retardation" is defined as "intellectual disability." HEALTH & SAFETY § 591.003(13). The term "intellectual disability" means "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." *Id.* § 591.003(7-a). Based on the language in these definitions, we conclude that the legislature did not intend for "mental retardation" to be considered as being "of unsound mind." Additionally, the legislature provided in Section 593.054 of the Act that "[a]n order for commitment [under Section 593.052] is not an adjudication of mental incompetency." *Id.* § 593.054.

Section 593.052 establishes the elements that an applicant must prove to obtain an order of commitment of a person with mental retardation to a residential care facility. Section 593.050(e) provides that the applicant has "the burden to prove beyond a reasonable doubt that long-term placement of the proposed resident in a residential care facility is appropriate." *Id.* § 593.050(e). Of importance, the legislature did not include a requirement in either Section 593.050 or Section 593.052, or in any other section, that the applicant must present expert medical or psychiatric testimony or evidence to satisfy its burden of proof. We find it significant that, on the other hand, the legislature has expressly provided that a trial court's order committing a mentally ill patient for court-ordered extended inpatient mental health services must be supported by "competent medical or psychiatric testimony." *Id.* § 574.035(g). Because the legislature has not included

[2]*See* TEX. HEALTH & SAFETY CODE ANN. §§ 591.001–597.054 (West 2010 & Supp. 2013).

13

a requirement of competent medical or psychiatric testimony in Section 593.050 or Section 593.052, we conclude that expert medical or psychiatric testimony or evidence is not required to support a trial court's commitment order under Section 593.052. However, a lack of medical or psychiatric testimony may be crucial to the determination of a sufficiency challenge. A.W.'s second issue is overruled.

In her third issue, A.W. challenges the legal and factual sufficiency of the evidence to support the trial court's commitment order. An applicant must prove the following elements under Section 593.052(a) to obtain a commitment order:

> (1) the proposed resident is a person with mental retardation;
>
> (2) evidence is presented showing that because of retardation, the proposed resident:
>
> > (A) represents a substantial risk of physical impairment or injury to himself or others; or
> >
> > (B) is unable to provide for and is not providing for the proposed resident's most basic personal physical needs;
>
> (3) the proposed resident cannot be adequately and appropriately habilitated in an available, less restrictive setting; and
>
> (4) the residential care facility provides habilitative services, care, training, and treatment appropriate to the proposed resident's needs.

*Id.* § 593.052(a).

The party that files the application for long-term commitment has the burden to prove beyond a reasonable doubt each of the elements set forth in Section 593.052(a). *Pratt v. State*, 907 S.W.2d 38, 45 (Tex. App.—Dallas 1995, writ denied); *see also* HEALTH & SAFETY § 593.050(e). Because the long-term commitment statute employs a beyond-a-reasonable-doubt burden of proof, under

a legal sufficiency review, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find, beyond a reasonable doubt, the elements required for commitment to a residential care facility. *See In re Commitment of Mullens*, 92 S.W.3d 881, 885 (Tex. App.— Beaumont 2002, pet. denied). Under a factual sufficiency review of the evidence in a civil case in which the burden of proof is beyond a reasonable doubt, we weigh the evidence to determine whether a verdict that is supported by legally sufficient evidence nevertheless reflects a risk of injustice that would compel ordering a new trial. *In re Commitment of Day*, 342 S.W.3d 193, 213 (Tex. App.—Beaumont 2011, pet. denied).

A.W. contends that the evidence was legally and factually insufficient to support the trial court's conclusions (1) that she represents a substantial risk of physical impairment or injury to herself or others (Section 593.052(a)(2)(A)), (2) that she is unable to provide for and is not providing for her most basic personal physical needs (Section 593.052(a)(2)(B)), and (3) that she cannot be adequately and appropriately habilitated in an available, less restrictive setting (Section 593.052(a)(3)).

An applicant satisfies its burden under Section 593.052(a)(2) if it proves, because of retardation, the proposed resident either (A) represents a substantial risk of physical impairment or injury to herself or others or (B) is unable to provide for and is not providing for the proposed resident's most basic physical needs. As shown above, the trial court made numerous findings of fact related to its finding that A.W. represents a substantial risk of physical impairment or injury to herself or others. In this respect, the trial court found that A.W. had engaged in self-injurious behaviors within the past month at SASH in which she had tied objects and clothing around her neck with the intent of making herself "pass out" or "go to sleep." The trial court found that it had been necessary for the staff at SASH to

intervene to remove the objects and clothing from A.W.'s neck and that, based on A.W.'s behavior, the SASH staff had been required to physically restrain, mechanically restrain, and chemically restrain A.W. The trial court also found that A.W. had been assaultive and aggressive toward the staff at SASH.

The record contains ample evidence, including records from SASH, to support the trial court's findings related to A.W.'s self-injurious behavior and the necessity to restrain A.W. as a result of her behavior. One SASH record indicated that A.W. wrapped items around her neck on a nightly basis. Based on the evidence, a rational trier of fact could have found beyond a reasonable doubt that A.W. represents a substantial risk of physical impairment or injury to herself or others. We conclude that the evidence was legally and factually sufficient to support the trial court's finding on this issue. Because PBCC satisfied its burden of proof under Section 593.052(a)(2)(A), we need not determine whether the evidence was legally and factually sufficient to support the trial court's finding under Section 593.052(a)(2)(B).

A.W. also challenges the legal and factual sufficiency of the evidence to support the trial court's finding under Section 593.052(a)(3) that she could not be adequately and appropriately habilitated in an available, less restrictive setting. As the trial court found, A.W. presented evidence that a program called Chrysalis was willing to accept A.W. Chrysalis is a home- and community-based services (HCS) program. Dirden testified that the SSLC is an Intermediate Care Facility (ICF) and that an ICF is considered to be more restrictive than an HCS, such as Chrysalis. Dirden acknowledged that PBCC had the duty to find the least restrictive placement for A.W. Dirden and Barbara McDaniel, who was a Department employee, both testified that they believed that A.W. could not be adequately and appropriately habilitated at Chrysalis. McDaniel testified that the Department had been unable to locate a placement for A.W. Dirden said that she did not know

whether A.W. could be habilitated in a place other than the SSLC. A.W.'s treatment team at SASH believed that the Chrysalis program would be the most appropriate placement for A.W. Chrysalis's director testified that he believed that Chrysalis could meet A.W.'s needs. PBCC did not present any medical or psychiatric testimony that Chrysalis could not adequately and appropriately habilitate A.W.

The parties presented conflicting evidence on the issue of whether A.W. could be adequately and appropriately habilitated in an available, less restrictive setting. Based on the evidence, we conclude that a rational trier of fact could have found beyond a reasonable doubt that A.W. cannot be adequately and appropriately habilitated in an available, less restrictive setting. Therefore, the evidence was legally sufficient to support the finding. However, given the nature of the evidence, especially the lack of expert medical or psychiatric testimony supporting the trial court's finding, we conclude that the finding reflects a risk of injustice that compels ordering a new trial. Accordingly, the evidence was factually insufficient to support the trial court's finding.

A.W.'s third issue is sustained to the extent that she challenges the factual sufficiency of the evidence to support the trial court's finding that she could not be adequately and appropriately habilitated in an available, less restrictive setting. Otherwise, A.W.'s third issue is overruled. Based on our rulings on A.W.'s first and third issues, we need not address her fourth issue. *See* TEX. R. APP. P. 47.1.

We reverse the trial court's order of commitment, and we remand this cause to the trial court for further proceedings consistent with this opinion.


August 21, 2014                                          JOHN M. BAILEY

Panel consists of: Wright, C.J.,                         JUSTICE
Willson, J., and Bailey, J.